Kurt David Hermansen, CA Bar No. 166349
Supervisory Assistant Federal Public Defender
859 Willamette Street, Suite 200
Eugene, Oregon 97401
(541) 465-6937 Telephone
(541) 465-6975 Facsimile
Kurt_Hermansen@fd.org

Attorney for Defendant

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> DAVID CHRISTOPHER NOBLE, <br><br> Defendant. | Case No. 6:23-cr-00181-MC-1 <br><br> **Sentencing Memo** |

The Defendant, David Christopher Noble, respectfully requests a sentence of time-served (of 10 months and 11 days) plus 3 months' home confinement as a condition of supervised release. A prison sentence of 12 months and 1 day appears to be a typical sentence in the very few cases that have been prosecuted federally under 18 U.S.C. § 48 where the defendants were directly involved in personally creating obscene "animal crush" videos. Here, Noble was not personally involved in harming animals himself as the direct perpetrator was overseas when that perpetrator harmed the animals and created the videos.

Despite the serious nature of animal torture videos, Noble was one in a group of individuals who collectively managed to pay someone in a foreign country to torture little monkeys

(macaques) and videotape the torture for group member's pathological viewing pleasure.[1] Noble did not, and there is no evidence he ever has or ever will, personally hurt any animal. But the chat messages he sent to group members display a morbid fascination with macaques suffering, which cries out for psychological treatment for Noble.

Unlike videos distributed by PETA (People for the Ethical Treatment of Animals) and unlike fake sadistic scenes in blockbuster movies and ostensibly fake scenes of people eating monkey brains in cult films like "Faces of Death," the animal torture videos that Noble and his co-conspirators commissioned have no redeeming value. PETA has posted videos of macaques being abused in a lab in Hillsboro, Oregon, not to glorify the abuse but to shed light on and try to stop the cruelty. So, those videos of animal cruelty are protected under the First Amendment.

Unlike the dog-fight videos that were at issue when the Supreme Court struck down a prior version of 18 U.S.C. § 48,[2] Noble does not contest that one or more of the videos that was produced here qualifies as obscene and thus is afforded no First Amendment protection.

---

[1] The little monkeys (macaques) in the videos at issue here are the same type of monkeys (macaques) that were tortured for years at a lab here in Oregon. According to PETA, the Oregon National Primate Research Center (ONPRC) imprisoned 4,200 primates and received more than $30 million a year in taxpayer funding to torment the macaques in cruel, useless, and deadly experiments. During a four-month undercover investigation inside the facility, PETA documented that monkeys were driven insane by laboratory conditions. The investigation revealed that the monkeys were confined to small, barren cages and lived in constant fear of employees' abusive handling. Detailed descriptions and video evidence of the animal cruelty can be found online *See* https://www.peta.org/features/onprc/; *see also* https://www.dailymail.co.uk/news/article-8326567/Oregon-lab-forcing-pregnant-monkeys-eat-lard-nicotine-alcohol-addicts.html.

[2] *United States v. Stevens*, 559 U.S. 460 (2010) (holding that the former version of 18 U.S.C. § 48 criminalizing the commercial creation, sale, or possession of depictions of animal cruelty was substantially overbroad, and thus facially invalid under the First Amendment protection of speech).

## I.    U.S. Sentencing Guidelines (USSG) and PSR objections that require this Court's resolution.

The parties disagree about two USSG provisions, and Noble has lodged objections to the Guidelines as set forth in the PSR. Noble's first objection is to the proposed 5-level enhancement under § 2G3.1(b)(1)(B). Noble incorporates by reference that detailed objection lodged as set forth in the addendum to PSR. The second objection concerns the PSR's failure to recommend a 2-level Zero-Point-Offender adjustment. That second objection is fleshed out below.

- The parties **agree** the **Base Offense Level is 10**.

- Noble **objects** to the proposed 5-level enhancement under § 2G3.1(b)(1)(B). *See addendum to PSR for legal objections.*

- The parties **agree** that a 2-level enhancement applies under § 2G3.1(b)(3) for use of a computer.

- The parties **agree** that a 4-level enhancement applies under § 2G3.1(b)(4) because the animal-torture videos are sadistic.

- The parties **agree** that a 3-level reduction applies under § 3E1.1(b) for acceptance of responsibility.

- Noble submits that the **resulting offense level** should be **13, not 18**.

- And Noble argues that with a 2-level Zero-Point Offender adjustment under § 4C1.1, the **total offense level is 11**.

  - **Objection.** The PSR fails to adjust downward 2 levels under § 4C1.1, claiming that the offense "result[ed] in death or serious bodily injury"

because videos depicted "death or serious bodily injury of **monkeys**."

PSR Addendum (emphasis added).

o The PSR is wrong to because monkeys are not people. Nothing anywhere in the Guidelines even hints at including the death or serious bodily injury of nonhuman animals or insects as a disqualifier for the zero-point offender adjustment. Rather, everywhere the terms "death or serious bodily injury" are found throughout the Guidelines, those terms explicitly or implicitly refer to humans, never to nonhuman animals or insects. *See, e.g.*, § 2A2.4 comment. app. n. 2; § 2A3,1 comment. app. n. 2(A); § 2A3.2 comment. app. n. 5; § 2A3.4 comment. app. nn. 2–3.; § 2B1.1(b)(16); § 2B3.2(b)(3)(B); § 2.B3.2 comment. app. n. 7; § 2B5.3(b)(6) & comment. app. nn. 3, 5(D); § 2.D1.1(a); § 2D3.1; § 2G1.1 comment. app. n. 4; § 2G1.3 comment. app. n. 5(B)(i) & (iii); § 2G2.1 comment. app. n. 2; § 2G2.6 comment. app. n. 3; § 2K1.3 comment. app. n. 10; § 2K1.4(a)(1)–(2), (c)(1), comment. app. n. 2; § 2K2.1 comment app. nn. 7, 11; § 2L1.1(b)(6) comment. app. n. 3; § 2L1.2 comment. app. n. 7. If the Sentencing Commission intended to expand the terms "death or serious bodily injury" to include nonhuman animals and insects it could have done so.[3]

---

[3] Moreover, the obscenity guideline does not mention death or serious bodily injury. So, conspicuously absent from the obscenity guideline is any mention of seriously injuring or killing nonhuman animals. *See* § 2G3.1.

- Because Noble is in Criminal History Category I, his **Guidelines' range is 8-14 months**.

- 12 months and 1 days appears to a typical sentence in other comparable prosecutions brought under 18 U.S.C. § 48. Thus, a time-served sentence is sufficient but not greater than necessary under § 3553(a) based on the following mitigating factors.

## II. A time-served sentence, with 3 months' home confinement as a condition of supervised release is appropriate given the following factors:

### A. Age (§ 5H1.1)

In early June, Noble will be 49 years old. Age and criminal history exert a strong influence on recidivism. For offenders in Criminal History Category I, the rearrest rate ranges from 53.0 percent for offenders younger than age 30 at the time of release to 11.3 percent for offenders age 60 or older.[4]

---

[4] See US Sentencing Commission's *The Effects of Aging on Recidivism Among Federal Defenders* (Dec. 2017).



Fig. 1 Total Arrests by Age
All 2016 U.S. Arrests Compared to Recidivism Study Offenders' Arrest Records

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05_OFFUPDT and U.S. Department of Justice, Federal Bureau of Investigation Uniform Crime Report, *Crime in the United States* (2015). The Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

The Effects of Aging on Recidivism Among Federal Offenders | 11

## B. Medical Condition — Crohn's Disease

If this Court sentences Noble to time served with a period of home confinement, he's guaranteed access to VA medical services and VA psychological services with the support of his stable and supportive stepfather and mother in Nevada. But if Noble remains in BOP custody, his access to optimal medical and psychological treatment is tenuous. Under § 3353(a), home confinement will "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

### 1. Crohn's disease is best treated out of custody to avoid further surgeries to remove more of Noble's lower digestive tract.

Chron's disease is a chronic autoimmune inflammatory bowel disorder whose exact cause is unknown. The lining of the digestive tract becomes inflamed, leading to the cardinal symptoms of Crohn's disease, which include abdominal pain, diarrhea, fatigue, and weight loss. The inflammatory process can lead to scarring and narrowing of the digestive tract (strictures) which can

result in obstruction of the small and/or large bowel. Abscesses (pockets of infection) and fistulas (abnormal openings between the digestive tract and other organs) can develop. Most patients require ongoing management with medication and, often, surgery. The development of strictures, abscesses, and fistulas often requires surgical intervention. Crohn's disease also increases the risk of blood clots and certain forms of cancer. While the symptoms of Crohn's disease can be challenging to manage, many people with this condition can live a normal lifespan.

a. Noble, age 48, was diagnosed with Crohn's disease in October of 1998 at the age of 23. He was hospitalized with severe abdominal pain and thought to have appendicitis. He underwent **surgery**, which found a normal appendix along with ulcerations and strictures in his small and large intestines. **Thirty inches of intestine were removed during this initial surgery,** and he was diagnosed with Crohn's disease.

b. He had no treatment for his condition until 2001 when he was **hospitalized** for fever, diarrhea, and weight loss. Upper and lower endoscopy of his digestive tract showed **ulcerations from his Crohn's disease in his stomach as well as his small intestine**.

c. Following this hospitalization, numerous medications, including steroids, were tried unsuccessfully and Noble was **hospitalized again in 2002**.

d. Noble took Humira on and off leading up to 2009. He should not have any disruptions in his Humira treatments given persistent ileal disease. A colonoscopy and CT imaging identified areas of significant stenosis from recurrent fibrostenotic Crohn's disease.

e.  **In June of 2009, Noble underwent another intestinal resection surgery** to address a bowel obstruction and remove diseased portions of his intestines.

f.  Diagnosis at a young age, disease involvement throughout the digestive tract, and failure to respond to steroid treatment as in Noble's case are indications of a more severe form of Crohn's disease and a higher risk of complications in the future.

g.  From February 2010 to March 2012, Noble received Humira injections every other week.

h.  In late 2012, Noble discontinued using Humira for some months because he could not afford the out-of-pocket expenses. His doctors ordered an MRI that show narrowing, wall thickening, and diffuse enhancement of the neoterminal ileum, which caused a small-bowel obstruction. Without Humira, Noble's doctors resorted to prescribing a low residue diet and using prednisone with methotrexate given Noble's exquisitely tender right lower quadrant, diminished bowel tones, and distention. Doctor notes also reveal frustration with Noble's very high level of anxiety and his impulsively wanting surgery (because it worked before) as a quick way to end the pain rather than deliberating logically about going back on Humira as the best treatment option.

i.  In 2017, a colonoscopy showed ulceration with stricture formation in Noble's digestive tract.

j.  Humira, a biologic medication used to treat many autoimmune diseases, was prescribed but Noble was again unable to afford it.

k.  Thankfully, by June of 2018, he had switched his health care to the VA and started taking Humira regularly. By August of 2018, his diarrhea had improved significantly.

l.  In 2020, he was having more abdominal pain and the frequency of his Humira injections was increased from every 14 days to every 7 days.

m.  As of March 2023, Noble continued on this dose and his abdominal pain was improved although he continued to have 5-6 bowel movements daily.

n.  Tragically, Noble's subsequent arrest and incarceration led to an interruption in the regular dosing of his Humira.

o.  While incarcerated, Noble has 8-9 BMs daily along with recurrent right-sided abdominal pain.

p.  A time-served sentence with three month's home confinement would give Noble the best chance of receiving humane and optimal treatment of Crohn's disease, which could help prevent additional surgeries.

## C.  Protecting the public from further crimes of the defendant

Home confinement with access to VA psychological services and medications is the best way to help Noble move away from the depravity of the animal-torture group he once associated with online. Supervised Release conditions could include monitoring computers and smart devices that Noble uses.

### D.  Military service (§ 5H1.11)

Although Noble was effectively discharged from the military, he qualifies for VA medical benefits because of his years of ROTC service. But for his Crohn's disease, it is highly likely that Noble would be a senior officer in the Air Force. Noble's singular focus from an early age was his dream of becoming an Air Force pilot. He did everything possible to make that dream a reality and just as his dream came to fruition, it was snatched from him. Although Noble was in ROTC and graduated from the Air Force flight school in 1999 at age 24 (only 6 out of 37 students graduated) and although he "got his wings," his dream of being a successful pilot were dashed by Chron's disease's destructive recurrence in 2001. Psychologically, Noble never recovered. The Air Force could not risk Noble getting sick while deployed in Afghanistan. So, the military informed Noble they "did not need him." He was devastated and remains so. More than 20 years later, Noble is still crushed by the reality that Crohn's disease permanently sidelined his dream.

### E.  Mental and Emotional Condition (§ 5H1.3)

PSR paragraphs 64–70 provide mitigating information. Noble suffers from depression and anxiety. He needs counseling and psychological treatment.

### F.  Stable Housing — Suitable for Home Confinement

The letter submitted to the Court from Noble's stepfather and mother shows that they are ready, more than willing, and more than able to house Noble and ensure that he attends medical and psychological services and obtains medications through the nearby VA.

### G. Non-violent offender

Noble has no history of violence. And while a coconspirator committed acts of violence against macaques at the behest of the animal-torture group, Noble's personal offense conduct involved arms-length internet interactions, not hands-on acts of violence, which distinguishes him from many defendants who have been convicted under 18 U.S.C. § 48.[5]

## III. Conclusion

Based on the foregoing, a sentence of time-serve (of 10 months and 11 days) plus 3 months' home confinement as a condition of supervised release is sufficient but not greater than necessary.

Respectfully submitted: April 17, 2024.

*s/ Kurt David Hermansen*
Kurt David Hermansen
Supervisory Assistant Federal Defender

---

[5] Noble's communications within the group reveal a very disturbing fixation. At the same time, a rampant dark side of human nature abounds in our modern "civilized" society. Violence surrounds us and infects the internet because platforms like YouTube use algorithms that promote, encourage, and drive people to consume more and more divisive and shocking content. *See* https://sentientmedia.org/advocates-fight-back-against-rise-of-animal-cruelty-on-facebook-and-youtube/.

Although wildly popular violent video games and violent blockbuster movies are fake, they often depict all sorts of violent depravity, including beheadings, disembowelment, mass murder, shootouts, and blood splatter, etc. Why is such violence so popular? Violent depictions remain legally protected by the First Amendment, but at what societal cost? What are all these violent depictions doing to people's minds? See *Do video games exert stronger effects on aggression than film? The role of media interactivity and identification on the association of violent content and aggressive outcomes* and *The role of media exposure on relational aggression: A meta-analysis*.